1  JACQUELINE DESOUZA, State Bar No.:133686
   DESOUZA LAW OFFICES, a professional corporation
2  1615 Hopkins Street
   Berkeley, CA 94707
3  Tel/Fax:    (510) 649-3420

4  Attorneys for Defendants
   Apparent Inc; Apparent Energy Inc;
5  Apparent Solar Inc; Xslent Energy Technologies, LLC

6

7               IN THE UNITED STATES DISTRICT COURT

8               NORTHERN DISTRICT OF CALIFORNIA

9  AI-DAIWA, LTD                    Case No. CV 13-04156 **(YRG)**

10           Plaintiff,            **AMENDED**
                                   DECLARATION OF JACQUELINE
11     vs.                         DESOUZA IN SUPPORT OF MOTION TO
                                   DISMISS FIRST AMENDED
12  APPARENT, INC., a Delaware corporation;   COMPLAINT PURSUANT TO FEDERAL
    APPARENT ENERGY, INC., a Delaware   RULES OF CIVIL PROCEDURE, RULES
13  corporation; APPARENT SOLAR, INC., a   12(b)(3); 12(b)(6)
    Delaware Corporation; APPARENT SOLAR
14  INVESTMENTS, LLC, a Hawaii limited   Date: December 3, 2013
    liability company; XSLENT, LLC, a Delaware   Time: 2:00 p.m.
15  limited liability company; XSLENT ENERGY   Dept: Courtroom E, 2nd Floor
    TECHNOLOGIES, LLC, a Delaware limited
16  liability company; and DOES 1-10 inclusive,   Complaint filed: September 9, 2013
                                   First Amended Complaint filed: October 8,
17           Defendants.           2013
    _____/
18

19  I, Jacqueline deSouza, declare:

20  I am an attorney at law licensed to practice before the Courts of this State and am a member of

21  Desouza Law Offices, PC attorneys of record for Defendants Apparent Inc., Apparent Energy Inc.,

22  Apparent Solar Inc., and Xslent Energy Technologies, LLC (collectively for purposes of this

23  declaration, "Apparent").  I make this declaration based on my role as custodian of our firm's client

24  files and based on my personal knowledge and if called as a witness could and would so testify.

        1.
25      I file this declaration to correct exhibits filed on October 9th in support of Apparent's Motion to

26      Dismiss, Docket No. 7.  The exhibits incorrectly redacted parts of exhibits and incorrectly did

27      not redact parts of exhibits. The correction of the exhibits does not otherwise impact the

28      Motion to Dismiss.

2. Attached hereto and incorporated herein by reference as Exhibit A are true and correct copies of relevant pages of the Customer Supply Chain Agreement ("Contract") entered into between Advanced Innovations USA, LLC and Apparent, Inc effective July 21, 2011. The Contract is proprietary and contains confidential pricing, quality, and specification information and only relevant sections are submitted. I have filed an administrative motion to permit the filing of this and other exhibits in redacted form. I have also requested that Plaintiff stipulate to the District Court's standard protective order.

3. Attached hereto and incorporated herein by reference as Exhibit B is a true and correct copy of a Purchase Order Apparent issued to Advanced Innovations in July of 2011 pursuant to the terms of the Contract. The Purchase Order contains proprietary and confidential pricing and terms and is submitted in redacted form.

4. In December of 2011, Robert O'Donnell, a Director of AI-Daiwa, Ltd contacted me and requested that the July 2011 Purchase Order be re-issued to AI-Daiwa Ltd. I am informed and believe, based on Mr. O'Donnell's representations, that AI-Daiwa Ltd is a Hong Kong based joint venture between Advanced Innovations USA LLC and Daiwa Ltd. To ensure that the terms of the Contract continued to apply to the re-issued Purchase Order, the parties entered into Addendum No. One to Customer Supply Chain Agreement which governed the terms of the re-issued Purchase Order. A true and correct copy of Addendum No. One to the Customer Supply Chain Agreement is attached as Exhibit C. The re-issued Purchase Order contains proprietary and confidential pricing and terms and is submitted in redacted form.

5. After manufacturing started and at various times over the course of the past twelve months, I participated in meetings and calls with Mr. O'Donnell and Frederick Wan of AI-Daiwa regarding reconciling deliveries, returns, payments and credits for returns. In the course of the reconciliation, Apparent identified specific product that was defective and AI-Daiwa agreed to process the return of the defective devices, in each instance crediting Apparent's account.

6. The Contract specifies that if a dispute arises and cannot be resolved it will be submitted first to mediation. (See, Exhibit A at paragraph 16, page 10.) Neither Apparent nor I have received a request for mediation.

AMENDED DECLARATION OF JACQUELINE DESOUZA IN SUPPORT OF MOTION TO DISMISS
Page 2 of 3

7.  On October 9, 2013, I wrote to Brock Lyle, counsel for AI-Daiwa, Ltd, and requested that AI-Daiwa consent to dismiss this action and engage in mediation. Mr. Lyle responded on October 18th advising that his client was considering the request for mediation.

I declare under penalty of perjury, under the Laws of California and the United States, that the forgoing is true and correct. Executed on October 22, 2013, Berkeley, California.

By:      /s/ Jacqueline deSouza

Jacqueline deSouza

EXHIBIT A

## CUSTOMER SUPPLY CHAIN AGREEMENT

THIS CUSTOMER SUPPLY CHAIN AGREEMENT ("Agreement") is effective as of the 21st day of July 2011, (the "Effective Date"), between Advanced Innovations, U.S.A. L.L.C., a limited liability company duly organized and existing under the laws of the State of Alabama, the United States of America, having a place of business at 8004 Charlotte Drive, Huntsville, Alabama 35802, USA ("AI") and Apparent Energy Inc., a Delaware corporation ("Apparent Energy"), having offices at 7428 Redwood Blvd., Suite 102, Novato, CA 94945.

### 1.   DEFINITIONS

For all purposes of this Agreement, terms which are capitalized shall have the meanings assigned below or defined elsewhere in the Agreement:

"AVL" means Apparent Energy's approved vendor list.

"BOM" means Apparent Energy's bill of materials.

"Components" means parts and raw materials purchased in support of the Supply Chain Services.

"Confidential Information" is given that meaning set forth in the parties' Mutual Non-disclosure and Confidentiality Agreement, dated the 29th April 2011, a copy of which is attached as Schedule F and incorporated into this Agreement.

"AE-furnished Items" means the software, firmware, equipment, tooling, Components owned by Apparent Energy or documentation that the parties agree shall be used for Supply Chain Services.

"ECO" means an engineering change order for use by the parties in changing the design or other engineering Specifications by which the Products are manufactured.

"Environmentally Compliant" means compliance with any environmental laws applicable to the Products.

"Firm Order Period" means that period of a Forecast for which Apparent Energy cannot reduce or increase quantity.

"Force Majeure Event" means the occurrence of the one of more of the circumstances defined in Section 12.1.

"Forecast" means a projection for supply of Products for fifty-two weeks, as set forth in section 5.

"Long Lead-Time Components" means those Components with lead times greater than ninety (90) days.

"NRE Charges" means all manufacturing related, non-recurring engineering and set up charges associated with manufacture of Apparent Energy's Products, including but not limited to stencils, wave solder pallets, mechanical assembly fixtures, PCB artwork and testing NRE from suppliers, capital equipment unique to manufacture of Apparent Energy's Products (such as test equipment and fixtures, potting equipment).

"MOQ" means the minimum quantity of Products, of any type or any combination, that Apparent Energy is required to Order under this Agreement.

"NCNR Components" means components that after best practices for re-use, return, or resale have been exhausted are non-cancellable and non-returnable.

"Obsolete Components" means Components for which there is no demand after best practices for re-use, return, or resale as a result of an ECO.

"Orders" means purchase orders from Apparent Energy.

SUPPLY CHAIN AGREEMENT
PAGE 1
(Execution Copy)





"Partners" means those manufacturers, vendors, subcontractors, and other service providers necessary or desirable in AI's reasonable opinion, to complete the Supply Chain Services as set forth in Schedule A, who shall be hired by or contracted with AI subject to Apparent Energy's rights as set forth in this Agreement.

"Prices" means the prices for Products and Supply Chain Services as set forth in Section 9 and Schedule A to this Agreement.

"Process" means the process utilized by AI's and/or its Partners in order to provide the Supply Chain Services.

"Product Quotation" means a proposal by AI for pricing of manufacturing, and Supply Chain Services for each Product.

"Products" means the devices specified in Schedule A.

"RMA" means return material authorization.

"Specifications" means Apparent Energy's requirements for the construction, performance, and appearance of the Product, as described in Schedule B and as may be updated from time to time, including but not limited to: (i) detailed electrical, mechanical, testing as described in Schedule C, performance and appearance specifications for Product, (ii) the BOM; (iii) tooling specifications, along with a detailed description of the operation thereof, (iv) artwork drawings, (v) Component specifications, (vi) AVL, and (vii) labeling and packaging requirements as described in Schedule D.

"Supply Chain Services" means assisting Apparent Energy to obtain product safety certification approvals, sourcing of Components and locating alternate components to be approved by Apparent Energy, testing, supply chain management, after-sales service to include but not be limited to handling delivery and shipment, warranty and returns, auditing, record-keeping, engineering and related services which include but are not limited to manufacturing and  process development, alternative component selection and approval, design of quality control procedures, design for manufacturing and cost reduction proposals.

## 2.    GENERAL OBLIGATIONS OF THE PARTIES

2.1    AI.    AI shall perform its obligations set forth in this Agreement on the terms and conditions set forth herein.

a.    Subject to sections 8 (Quality), 9(Delivery), and Schedules A, B, C, D, E, and subject to Apparent Energy's right to audit, inspect, and require corrective or remedial measures, AI shall have sole responsibility for managing and completing the Supply Chain Services and contracting with, retaining, managing, and communicating with any Partners.  AI shall diligently and in good faith meet agreed-upon deadlines and delivery dates in accordance with Forecasts provided by Apparent Energy.

b.    AI shall manufacture Products identified in Schedule A in accordance with Specifications set forth in Schedule A and B and shall comply with Quality Standards described in section 8 and Schedule C ("Quality Standards").

c.    AI shall comply with Reporting, Inspection, and Auditing procedures as follows:



(i)    AI agrees that Apparent Energy's Coordinator and his designated representatives shall have the right upon reasonable notice and during normal business hours to inspect AI's (or its Partners') manufacturing facilities, the work in progress, and those offices areas containing documentation and records relevant to this Agreement.

SUPPLY CHAIN AGREEMENT
PAGE 2
(Execution Copy)

(iii)   AI and Apparent Energy shall work together to address quality issues identified by the inspection and audit process, however, the costs of implementing changes to the manufacturing process, including modifying testing procedures, to correct any deficiency shall be AI's sole responsibility.



e.   AI shall handle warranty and returns of Products it manufactures as set forth in Section 9 and Attachment E (Returns; and Returns; Warranty).



SUPPLY CHAIN AGREEMENT
PAGE 3
(Execution Copy)





a.      Apparent Energy shall issue a Purchase Order for a designated quantity for 90 days at the Price per unit agreed upon pursuant to this Agreement.  Subject to cost reductions as set forth in this Supply Agreement, Prices shall be fixed for a period of 90 days.



SUPPLY CHAIN AGREEMENT
PAGE 4
(Execution Copy)



appearance or place of manufacture of the Products) without prior written consent of Apparent Energy.   AI shall make ECO changes in accordance with Section 5.

8.2     Quality of Components.  AI shall use in its production of Products such Components  specified by Apparent Energy or approved prior to use by Apparent Energy, and shall purchase Components only from vendors appearing on the AVL.  AI is encouraged to propose alternative vendors to Apparent Energy who may improve quality, price, or delivery of Components to be included in the AVL.  Such inclusion of a vendor in the AVL shall be within Apparent Energy's sole discretion.

8.3     Inspection of Facility.   Upon prior reasonable written notice and during regular business hours, Apparent Energy or its designee may inspect the Products and Components held by AI or its Partners at AI or its Partners' facilities  provided such inspection does not unduly interfere with AI's or its Partners' operations.

9.      <u>PRICING; PAYMENT; AND DELIVERY</u>

9.1     Pricing

        a.      During the Initial Term, Apparent Energy shall purchase from AI the Products specified in Schedule A at Prices designated in Schedule A or agreed upon by the parties pursuant to sections 5 and 9.   All prices shall be in U.S. Dollars.

        b.      Prices shall include: (i) all Supply Chain Services, (ii) a twenty-four (24) month warranty for workmanship as set forth in Schedule E; and,



9.2     Payment

        a.      All payments owed by Apparent Energy shall be made in US dollars, net 60 days, meaning payment shall be due within 60 days following transfer of Products to a shipping carrier at a designated port.



        d.      AI has the right to charge Apparent Energy interest from the date of maturity to the date of payment at the rate of eight percent (8%) per annum, or the maximum permitted by applicable law, whichever is the lesser.



SUPPLY CHAIN AGREEMENT
PAGE 6
(Execution Copy)



14.   <u>ASSIGNMENT</u>

Neither this Agreement nor any rights or obligations hereunder shall be transferred or assigned by either party without the written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the prior sentence, Apparent Energy shall be entitled to assign this Agreement to a related entity, wholly-owned subsidiary, or parent company.



16..   <u>DISPUTES/CHOICE OF LAW</u>

All disputes related to this Agreement or the grounds for termination thereof shall be resolved as follows:  First, the senior management of both parties shall meet to attempt to resolve such disputes.  If the disputes cannot be resolved by the senior management, management within thirty (30) days, any party to the dispute may give written notice to the other party of its desire to commence mediation, and the mediation session must take place within (thirty) 30 days after the date that such notice is given.  The parties must jointly appoint a mutually acceptable mediator.  If the parties are unable to agree upon the appointment of mediator within seven (7) days after a party has given notice of the desire to mediate the dispute, any party may apply to the American Arbitration Association or such other organization or person agreed to by the parties in writing, for appointment of a mediator.  The parties agree to share equally in the cost of mediation but each party shall bear its own costs of preparation and attorneys' fees.   In the event mediation does not resolve the dispute, either party may proceed with litigation

This Agreement and the performance of transactions under this Agreement shall be governed by the laws of the State of California, excluding its choice of law rules. Should mediation, or suit be filed to enforce any claim or demand made pursuant to the terms of this Agreement (including its attachments), it shall be brought in Santa Clara County Superior Court and the parties submit to the venue and jurisdiction of this Court waiving all objections.

17.   <u>WAIVER</u>

No waiver of any term or provision of this Agreement will be valid unless such waiver is in writing signed by an authorized officer of the party against whom enforcement of the waiver is sought.  No waiver of any rights or breach of any provision of this Agreement constitutes a waiver of any other rights or breach of any other provisions, nor will it be deemed to be a general waiver of such provision by the waiving party or to sanction any subsequent breach thereof by any other party.

18.   <u>INTEGRATION CLAUSE AND MODIFICATION</u>

This Agreement (including the Schedules to this Agreement and any documents incorporated by reference) constitutes the entire understanding of the parties, superseding all previous agreements covering AI's manufacture of devices for Apparent Energy.

SUPPLY CHAIN AGREEMENT
PAGE 10
(Execution Copy)



This Agreement, including any Schedules or documents incorporated by reference, may not be modified except by a writing signed by authorized representatives of both parties. In the event of any conflict between a Schedule or document incorporated by reference and this Agreement, the terms of this Agreement shall take precedence.

19.   ORDER OF PRECEDENCE

All Orders, order acknowledgments and invoices issued pursuant to this Agreement are issued for convenience of the parties only and shall be subject to this Agreement. When interpreting this Agreement, precedence shall be given to the respective parts in the following order: (a) this Agreement; (b) Schedules to this Agreement; (c) Purchase Orders; (d) Orders used to release Product; and (e) other documents incorporated by reference.

20.   CONSTRUCTION

Each party has cooperated in the drafting and preparation of this Agreement and has been represented by counsel in such drafting and preparation. Accordingly, this Agreement shall be construed according to its fair meaning and not strictly for or against any party and any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the party that drafted it has no application and is expressly waived.

21.   COUNTERPARTS

This Agreement may be executed in two (2) or more counterparts, and by each party on the same or different counterparts, but all of such counterparts shall together constitute one and the same instrument and agreement of the parties. This Agreement may also be executed with facsimile transmission or by e-mailing of a scanned counterpart, which signatures shall have the same binding effect as original signatures.

22.   SURVIVAL

Sections of this Agreement relating to limitation of liability, warranties, confidentiality, exclusivity, notices, disputes and choice of law, and other such clauses which by their natures govern rights and obligations of the parties after the termination or cancellation of this Agreement shall survive such termination or cancellation.

23.   SEVERABILITY

All rights and remedies, whether conferred by this Agreement or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Agreement is held invalid by any law, rule, order, or regulation of any government or by the final determination of any court of competent jurisdiction, such invalidity shall not affect the enforceability of any other provisions and such provisions shall be interpreted so as to best accomplish the objectives of such invalid provision within the limits of applicable law or applicable court decisions.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective as of the date on page one, by their officers, duly authorized.

ADVANCED INNOVATIONs USA L.L.C.                    APPARENT ENGERY, INC.

By: _____                         By: _____
Signature                                            Signature
Typed Name: Robert O' Donnell                        Typed Name:  Stefan V. Matan
Title:  Chief Executive Officer                      Title:  Chief Technical Officer

SCHEDULE E -- WARRANTY AND MASS RETURNS

<u>WARRANTY</u>

1.      Warranty.  AI provides a warranty period for twenty four (24) months from date of delivery (the "Warranty Period") limited to correction of defects in workmanship.  For the purpose of this Section,



AI shall, at its option and at its expense, repair, replace or issue a credit for Product found defective during the Warranty Period.  In addition, AI will pass on to Apparent Energy all manufacturers' Component warranties to the extent that they are transferable, but will not independently warrant any Components.

<u>MASS DEFECTS</u>





## <u>Warranty and Return Information</u>

### Limited Warranty

This Limited Warranty is provided by Apparent Energy, Inc and covers defects in workmanship and materials in your A1000 unit. The warranty period for material defects and workmanship is two years from original date of purchase. This Limited Warranty is transferable to subsequent owners but any transfer or assignment does not extend the warranty period beyond two years following the original date of purchase. To make a warranty claim you or a subsequent owner will need proof of purchase of your A1000 device.

Apparent Energy's liability for any damage to or damage caused by use of an A1000 device shall, in no event, exceed the actual cost paid for the device.

### Apparent Energy's Obligations

Apparent Energy, at its option, will repair or replace the defective A1000 device free of charge, provided that Apparent Energy receives notice of the product defect within two years following the original purchase of the unit and that Apparent Energy determines a defect that is covered by this Limited Warranty exists.

Apparent Energy, at its option, will use new and/or reconditioned parts in performing warranty repair and building replacement products. Apparent Energy reserves the right to use parts or products of original or improved design in the repair or replacement. Any repair or replacement of an A1000 device will not extend the warranty period beyond two years following the original date of purchase or ninety days following the date the repaired device is returned to you, whichever is longer. All replaced products and all parts removed from repaired products become the property of Apparent Energy.

This Limited Warranty covers both parts and labor necessary to repair the A1000 device. Please contact Apparent Energy's customer service department for details on the company's policy regarding return shipping.

{00001826.DOC}

## Customer Service

If an A1000 device requires troubleshooting or warranty service, first contact your merchant.   If you are unable to contact your merchant, or the merchant is unable to provide service, contact Apparent Energy directly at:

| Contact Method | Contact Information |
|----------------|---------------------|
| Facsimile | 415.892.3182 |
| e-mail | support@apparent.com |

Direct returns may be performed according to the Apparent Energy Return Material Authorization (RMA) policy described in your product manual or access the Apparent Energy website (www.apparent.com) for additional information.

## What proof of purchase is required?

In any warranty claim, dated proof of purchase must accompany the product and the product must not have been disassembled or modified without prior written authorization by Apparent Energy.   Proof of purchase may include:

- The dated purchase receipt from the original purchase of the product at point of sale to the end user;
- The dated dealer invoice or purchase receipt showing original equipment manufacturer (OEM) status; or
- The dated invoice or purchase receipt showing the product exchanged under warranty.

## What does this warranty not cover?

This Limited Warranty does not cover normal wear and tear of the A1000 device or costs related to the removal, installation, or troubleshooting of the customer's electrical systems or a level of performance of your system.  This warranty does not apply to, and Apparent Energy will not be responsible for, any defect in or damage to the A1000 unit if:

1. the unit has been misused, neglected, improperly installed, physically damaged or altered, either internally or externally, or damaged from improper use or use in an unsuitable environment.
2. the unit has been subjected to fire, water, generalized corrosion, biological infestations, or input voltage that creates operating conditions beyond the maximum or minimum limits listed in the A1000 product specifications including high input voltage from batteries, generators, or lightning strikes.

{00001826.DOC}

3.  if anyone other than Apparent Energy or its authorized representative has attempted to perform repairs.
4.  the unit is used as a component part of a product expressly warranted by another manufacturer.
5.  the unit's original identification (trade-mark, serial number) markings have been defaced, altered, or removed.

### Disclaimer

THIS LIMITED WARRANTY IS THE SOLE AND EXCLUSIVE WARRANTY PROVIDED BY APPARENT ENERGY IN CONNECTION WITH YOUR A1000 DEVICE AND IS, WHERE PERMITTED BY LAW, APPLICABLE IN LIEU OF ALL OTHER WARRANTIES, CONDITIONS, GUARANTEES, REPRESENTATIONS, OBLIGATIONS AND LIABILITIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE IN CONNECTION WITH THE PRODUCT, HOW EVER ARISING (WHETHER BY CONTRACT, TORT, NEGLIGENCE, PRINCIPLES OF MANUFACTURER'S LIABILITY, OPERATION OF LAW, CONDUCT, STATEMENT OR OTHERWISE), INCLUDING WITHOUT RESTRICTION ANY IMPLIED WARRANTY OR CONDITION OF QUALITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE TO THE EXTENT REQUIRED UNDER APPLICABLE LAW TO APPLY TO THE PRODUCT SHALL BE LIMITED IN DURATION TO THE PERIOD STIPULATED UNDER THIS LIMITED WARRANTY.

IN NO EVENT WILL APPARENT ENERGY BE LIABLE FOR ANY SPECIAL, DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, COSTS OR EXPENSES HOWEVER ARISING WHETHER IN CONTRACT OR TORT INCLUDING WITHOUT RESTRICTION ANY ECONOMIC LOSSES OF ANY KIND, ANY LOSS OR DAMAGE TO PROPERTY, ANY PERSONAL INJURY, ANY DAMAGE OR INJURY ARISING FROM OR AS A RESULT OF MISUSE OR ABUSE, OR THE INCORRECT INSTALLATION, INTEGRATION OR OPERATION OF THE PRODUCT.  APPARENT's LIABILITY FOR ANY DAMAGE TO OR CAUSED BY THE A1000 UNIT IS LIMITED TO THE ACTUAL COST PAID FOR THE UNIT.

### Exclusions

If the A1000 unit is determined to be a consumer product, federal law does not allow an exclusion of implied warranties.   To the extent you are entitled to implied warranties under federal law, to the extent permitted by applicable law, implied warranties are limited to the duration of this Limited Warranty.   Some states and provinces do not allow limitations or exclusions on implied warranties or on the duration of an implied warranty or on the limitation or exclusion of incidental or consequential damages, so the above

limitation(s) or exclusion(s) may not apply to you. This Limited Warranty gives you specific legal rights. You may have other rights which may vary from state to state or province to province.

## Limitations on Use

Please refer to your product manual for limitations on uses of the product. SPECIFICALLY, PLEASE NOTE THAT THE A1000 SHOULD NOT BE USED IN CONNECTION WITH LIFE SUPPORT SYSTEMS OR OTHER MEDICAL EQUIPMENT OR DEVICES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, APPARENT ENERGY MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE USE OF THE A1000 IN CONNECTION WITH LIFE SUPPORT SYSTEMS OR OTHER MEDICAL EQUIPMENT OR DEVICES.

## Return Material Authorization Policy

Before returning a product directly to Apparent Energy you must obtain an RMA number and the correct factory "Ship To" address by using our website (www.apparent.com) or contacting Apparent Energy's customer support department at (415) 892-3182. Devices must be shipped prepaid. Shipments of any device that are not shipped pre-paid or shipped without an RMA number clearly marked on the outside of the shipping box, will be refused and returned to the sender.

When you contact Apparent Energy by e-mail or facsimile to obtain service, please follow the RMA procedures and be prepared to supply:
- The serial number of your device
- Information about the installation and use of the device
- Information about the failure and/or reason for the return
- A copy of your dated proof of purchase

## Return Procedure

1. Package the device safely, using the original box and packing materials or equivalent packing, and preferably fully insured. This warranty will not apply where the A1000 device is damaged in return shipping due to improper packaging.
2. Include the following:
   - The RMA number supplied by Apparent Energy clearly marked on the outside of the box.
   - A return address where the unit can be shipped. Post office boxes are not acceptable.

{00001826.DOC}



- ◇ A contact telephone number where you can be reached during work hours.
- ◇ A brief description of the problem.
3. Ship the device prepaid to the address provided by your Apparent Energy customer service representative.

If you are returning a product from outside the contiguous USA or Canada in addition to the above, you must include return freight funds and are fully responsible for all documents, duties, tariffs, and deposits.

## Out of Warranty Service

If the warranty period for your A1000 has expired, if the unit was damaged by misuse or incorrect installation, if other conditions of the warranty have not been met, or if no dated proof of purchase is available, your product may be serviced or replaced for a fee.

To return your A1000 for out of warranty service, contact Apparent Energy customer service department for an RMA number and follow the other steps outlined in "Return Procedure" on the Company's website www.apparent.com.

Payment options will be explained by the Customer Service Representative. In cases where the flat fee does not apply, as with incomplete units or units with excessive damage, an additional fee will be charged. If applicable, you will be contacted by a Customer Service Representative once your unit has been received. A deposit for out of warranty service may be required.

[00001826.DOC]



Schedule F – Non Disclosure Agreement

<u>MUTUAL NONDISCLOSURE AGREEMENT</u>

THIS MUTUAL NONDISCLOSURE AGREEMENT ("Agreement") is made and entered as of this 29 day of April, 2011 by and between Apparent Energy Inc., a Delaware corporation located at 7428 Redwood Boulevard, Novato, California (hereinafter referred to as "Company"), SolarNet Holdings LLC, a Delaware limited liability company located at 1500 Valley House Drive., Rohnert Park, CA 94928 (hereinafter referred to as "SolarNet") and Advanced Innovations, Advanced Innovations, L.L.C., an Alabama Corporation located at 8004 Charlotte Drive, Huntsville, Alabama 35802, USA (hereinafter referred to as "AI").   Company, SolarNet, Apparent Energy Inc., and AI are referred to herein collectively as the "Parties" and individually as a "Party").

WHEREAS, each Party acknowledges that each other Party has developed or is developing certain confidential or proprietary information that will be disclosed to the other Party or Parties in connection with this Agreement, including without limitation, information, materials and know-how relating to such Party's business, plans, operations, facilities, research, development, customer contacts, technology, products, suppliers, employees, agents, specifications, customer lists, financial statements, project solutions, internal analytical tools and methodologies, and services (collectively "Information"); and

WHEREAS, each Party wishes to exchange from time to time Information to be used for the purpose of advancing the technical and strategic planning for a possible contractual relationship based on the manufacture and distribution of products that relate to the Information for the mutual benefit of the Parties ("Purpose").

NOW, THEREFORE, in consideration of the mutual exchange of Information and consideration of the Purpose, the Parties agree as follows:

1) Each Party agrees to disclose Information to the other Party or Parties to be used by the receiving Party or Parties (hereinafter referred to collectively as the "Receiving Parties" and individually as a "Receiving Party") solely for the above-stated Purpose. The term "Information" shall be subject to the terms hereof regardless of the form in which such Information is communicated or maintained, whether disclosed directly or indirectly, prior to or during the term of this Agreement, whether oral, electronic (in the form of e-mail, CD, DVD or otherwise) visual in written or other tangible form, or stored in any other form or medium, together with all copies thereof, that is delivered or otherwise made accessible by or on behalf of the disclosing Party or Parties (hereinafter referred to collectively as the

[ Field Code Changed ]

[0000000.DOC] . . .    . . . .NONDISCLOSURE AGREEMENT



Schedule G -- Certificate of Insurance

ACORD **CERTIFICATE OF LIABILITY INSURANCE**

OP ID: JH

DATE (MM/DD/YYYY) 05/12/11

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | |
|---|---|---|
| Clarke & Sampson, Inc. | 703-683-6601 | |
| www.clarkeandsampson.com | | |
| 728 S. Washington St., Ste 200 | 703-739-8957 | |
| Alexandria, VA 22314-5404 | | |
| James L. Hebert | | |

PRODUCER'S ID#: ADVAN13

| INSURED | Advanced Innovations USA LLC |
| | Melanie Barrick |
| | 8004 Charlotte Drive suite 2 |
| | Huntsville, AL 35802 |

INSURER(S) AFFORDING COVERAGE

| | NAIC # |
|---|---|
| INSURER A: Hartford Insurance Company | |
| INSURER B: Sentinel Insurance Co. - SCIC | 11000 |
| INSURER C: Evanston Insurance Company | |
| INSURER D: | |
| INSURER E: | |
| INSURER F: | |

COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY | | | 42SBAEO7159 | 07/01/10 | 07/01/11 | EACH OCCURRENCE | $ 2,000,000 |
| | X COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | CLAIMS-MADE X OCCUR | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 4,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | POLICY PRO-JECT LOC | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | 42SBAEO7159 | 07/01/10 | 07/01/11 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | SCHEDULED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | X HIRED AUTOS | | | | | | | $ |
| | X NON-OWNED AUTOS | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | | | 42SBAEO7159 | 07/01/10 | 07/01/11 | EACH OCCURRENCE | $ 3,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 3,000,000 |
| | DEDUCTIBLE | | | | | | | $ |
| | X RETENTION $ 10,000 | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | | 42WECLF1198 | 07/01/10 | 07/01/11 | X WC STATU-TORY LIMITS OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | N / A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | (Mandatory in NH) | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |
| C | Prof. Liability | | | 60843618 | 07/01/10 | 07/01/11 | Per Claim | 2,000,000 |
| | | | | | | | Agg Limit | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

| CERTIFICATE HOLDER | TOWH-01 | CANCELLATION |
|---|---|---|
| To Whom It May Concern | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | | AUTHORIZED REPRESENTATIVE |

© 1988-2009 ACORD CORPORATION. All rights reserved.

ACORD 25 (2009/09)     The ACORD name and logo are registered marks of ACORD



EXHIBIT B

## Apparent

7428 Redwood Blvd, Suite 102
Novato, CA 94945
Phone 415-892-3182

**PURCHASE ORDER**

The following number must appear on all related
correspondence, shipping papers, and invoices:
**P.O. NUMBER: AI070711**

**TO:**
Advanced Innovations
8004 Charlotte Dr., Suite 2
Huntsville, AL
Jeff Barrick
Jeff.barrick@advancedinnovationsinc.com

**SHIP TO:**
Apparent Inc.
7428 Redwood Blvd, Suite 102
Novato, CA 94945

| P.O. DATE | REQUISITIONER | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 07/07/11 | Dan Tran | ocean | Ex factory | Net 60 |

| Line Item | P/N | Qty | Date | Unit Price | Extended |
|---|---|---|---|---|---|
| 1 | ATIRA 5328U | | 8-Jul | $ | $ 8,695.80 |
| 2 | ATIRA 5328 | | 8-Aug | $ | $ 6,281.60 |
| 3 | 31-0005-300-R10P | | 8-Aug | $ | $ 880.10 |
| 4 | ATIRA 5327 | | 29-Aug | $ | $ 188,376.00 |
| 5 | ATIRA 5328 | | 28-Aug | $ | $ 31,408.00 |
| 6 | ATIRA 5328 | | 20-Sep | $ | $ 7,327.00 |
| 7 | ATIRA5327 | | 9-Jan | $ | $ 7,324.00 |
| 8 | ATIRA 5328 | | 20-Oct | $ | $ 1,172,320.00 |
| 9 | ATIRA5327 | | 20-Oct | $ | $ 146,480.00 |
| 10 | ATIRA 5328 | | 20-Nov | $ | $ 1,318,860.00 |
| 11 | ATIRA5327 | | 20-Nov | $ | $ 146,480.00 |
| 12 | 31-0005-300-R10 | | 20-Nov | $ | $ 441,800.00 |
| 13 | 31-0009-300-R3P | | 20-Nov | $ | $ 87,550.00 |
| 14 | ATIRA 5328 | | 20-Dec | $ | $ 1,318,860.00 |
| 15 | ATIRA5327 | | 20-Dec | $ | $ 432,116.00 |
| 16 | 31-0005-300-R10P | | 20-Dec | $ | $ 176,720.00 |
| 17 | 31-0009-300-R3P | | 20-Dec | $ | $ 35,020.00 |
| 18 | ATIRA 5328 | | 1/20/2012 | $ | $ 1,311,533.00 |
| 19 | NRE- Tooling and Resources | 1 | | $ 567,727.30 | $ 567,727.30 |
| | | | | Total | $ 7,405,758.80 |

**EXHIBIT B**

Authorized by                                    7/22/2011
_____                                  _____
                                                 Date

*Armando Arias*                                  July 25, 2011
_____                                  _____
Accepted by                                      Date
Armando Arias   AI Huntsville Office Operations Manager

**Terms:**

1. Unit prices per quotes dated June 9, 2011 REV10 BOM from Jeff Barrick. If BOM costs are changed (reduced or increased), the unit price shall be changed accordingly.

   [Apparent.bom.rev10.xlsx]        [AI PO070711 worksheet]

2. Payment terms: Per Contract
3. NRE and Tooling cost – Per Contract
4. AI to place PO's against the same suppliers that Apparent has issued the initial 40K kits against.
5. Any material PO's that AI takes over from Apparent will be consumed per the manufacturing schedule (of the 40K kits) provided by Apparent. Once the PO commitment to these suppliers has been satisfied, AI can purchase material from the most competitive material source.
6. Packaging to meet ISTA-2A standard
7. Two year standard warranty, subject to increasing the warranty to 15 years for all manufactured units upon completion of accelerated life testing per IEC61215 standard.
8. Purchaser acknowledges that all Apparent Inc products embody proprietary technology and intellectual property that is subject to trade secret protection, approved and pending patents, copyrights, trade name protections. Purchaser agrees not to disclose, reverse engineer, exploit or create derivatives of Apparent Inc products, technology and intellectual property and agrees to keep confidential Apparent Inc and its related entities' products, technology, trade secrets, and intellectual property.

9. Assembly/Delivery dates to be confirmed in due course.

10. Unit prices per Apparent's   July 7th PO AI070711 as written on page 1 of this PO.

*A.A.*   July 25, 2011

EXHIBIT C

ADDENDUM NO. ONE TO CUSTOMER SUPPLY CHAIN AGREEMENT

Advanced Innovations, USA, L.L.C., an Alabama company ("AI") and Apparent Energy, Inc., a Delaware corporation ("Advanced Energy") enter into this Addendum as of the first of December, 2011, which shall be the effective date of this Addendum.

AI and Apparent Energy entered into the Customer Supply Chain Agreement ("Agreement") in which AI agreed to manufacture and deliver Products to Apparent Energy's specifications, at prices, and upon delivery dates as agreed upon. AI has requested that Apparent Energy amend the Agreement to permit the initial Purchase Order dated July 7, 2011, to include AI-Daiwa, Ltd.

Thus, the parties enter into this Addendum subject to the following terms and conditions:

1.  Apparent Energy agrees to re-issue the Purchase Order dated July 7, 2011, in the names of Advanced Innovations, USA, LLC., and AI-Daiwa, Ltd. In all other respects the terms and conditions of the July 7, 2011, Purchase Order shall remain the same, including but not limited to the unit pricing provisions to include cost reductions as set forth in the Agreement. A copy of the revised Purchase Order is attached to this Addendum.

2.  AI-Daiwa, Ltd., agrees to be bound by the terms of the Agreement for all purposes applicable for the performance of the July 7, 2011 Purchase Order. No rights other than as specified in the Agreement for the performance of the July 7, 2011 Purchase Order are conferred upon AI-Daiwa by this Addendum.

3.  AI agrees to hold harmless and indemnify Apparent Energy from and for all liability, damages, or loss arising from AI-Daiwa Ltd's, or Daiwa's failure to perform. In addition, AI agrees to be solely responsible for any failure by AI-Daiwa Ltd., or Daiwa's failure to perform any term of this Addendum or the Agreement. These provisions of paragraph 2, supersede any contrary term in the Agreement.

4.  This Addendum is limited in scope and does not alter or replace any term or condition of the Agreement or its attachments unless specifically addressed. Specifically, the Agreement's substantive provisions including but not limited to choice of law and venue provisions are not modified or superseded by this Addendum.

Wherefore, the parties representing that they have obtained all necessary consents to enter into this Addendum execute it as set forth below:

Advanced Innovations, LLC an Alabama
limited liability company

By: _____        Dated: __12_/_5_/_2011__.
Robert O'Donnell
President
Apparent Energy, Inc., a Delaware corporation

{00002458.DOCX}        ADDENDUM NO. ONE CUSTOMER SUPPLY AGREEMENT
Page 1 of 2



By: _____

Stefan Matan
Chief Technical Officer

Dated: ____12/5/2011_____

AI-Daiwa, Ltd

By: _____
Director,

Dated: __12/5/2011._____

{00002458.DOCX}
Page 2 of 2

ADDENDUM NO. ONE CUSTOMER SUPPLY AGREEMENT

 **Apparent**

7428 Redwood Blvd, Suite 102
Novato, CA 94945
Phone 415-892-3182

# PURCHASE ORDER

The following number must appear on all related
correspondence, shipping papers, and invoices:
**P.O. NUMBER: AI122011**

**TO:**
Al-Daiwa Limited
Blk G, 11/F, East Sun Ind. Ctr.,
16 Shing Yip Street
Kowloon, Hong Kong
James Chong
James-Chong.chi@daiwahk.com
Robert O 'Donnell
Robert.odonnell@advancedinnovationsinc.com

**SHIP TO:**
Apparent Inc.
7428 Redwood Blvd, Suite 102
Novato, CA 94945

| P.O. DATE | REQUISITIONER | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 12/20/2011 | Dan Tran | ocean | Ex factory | Net 60 |

| Line Item | P/N | Qty | Date | Unit Price | Extended |
|---|---|---|---|---|---|
| 1 | ATIRA 5328 | | 2/13/2012 | | $332,161.60 |
| 3 | ATIRA 5328 | | 2/20/2012 | | $413,635.20 |
| 5 | ATIRA 5328 | | 2/27/2012 | | $413,635.20 |
| 7 | ATIRA5328 | | 3/5/2012 | | $413,635.20 |
| 9 | ATIRA 5328 | | 3/12/2012 | | $413,635.20 |
| 11 | ATIRA 5328 | | 3/19/2012 | | $413,635.20 |
| 13 | ATIRA 5328 | | 3/26/2012 | | $413,635.20 |
| 15 | ATIRA 5328 | | 4/2/2012 | | $413,635.20 |
| 17 | ATIRA 5328 | | 4/9/2012 | | $413,635.20 |
| 19 | ATIRA 5328 | | 4/16/2012 | | $413,635.20 |
| 21 | ATIRA 5328 | | 4/23/2012 | | $413,635.20 |
| 23 | ATIRA 5328 | | 4/30/2012 | | $413,635.20 |
| 25 | ATIRA 5328 | | 5/7/2012 | | $413,635.20 |
| 27 | ATIRA 5328 | | 5/14/2012 | | $413,635.20 |
| 29 | ATIRA 5328 | | 5/21/2012 | | $413,635.20 |
| 31 | ATIRA 5328 | | 5/28/2012 | | $413,635.20 |
| 33 | ATIRA 5328 | | 6/4/2012 | | $413,635.20 |
| 35 | ATIRA 5328 | | 6/11/2012 | | $413,635.20 |
| | **Total Unit Cost** | | | | $7,363,960.00 |
| 36 | NRE- Resource Tooling (Lump Sum) | 1 | | $606,770.00 | $606,770.00 |

_____
Authorized by                          Date

_____
Accepted by                            Date

**Terms:**

1. This PO supersedes PO AI070711.
2. Unit prices are based on dated Dec 20, 2011 REV10.1 from Armando Arias. If BOM costs are changed (reduced or increased), the unit price shall be changed accordingly.



Microsoft Excel
97-2003 Worksheet

3. Payment terms: Per Contract
4. NRE for Resources tooling terms per contact.
5. NRE and Tooling cost -- AI to take this responsibility on with adequate PO coverage enough to zero out the cost of the equipment/NRE's. Any additional equipment/NRE charges must be approved by Apparent.
6. AI to place PO's against the same suppliers that Apparent has issued the initial 40K kits against.
7. Any material PO's that AI takes over from Apparent will be consumed per the manufacturing schedule (of the 40K kits) provided by Apparent. Once the PO commitment to these suppliers has been satisfied, AI can purchase material from the most competitive material source.
8. Packaging to meet ISTA-2A standard
9. Two year standard warranty, subject to increasing the warranty to 15 years for all manufactured units upon completion of accelerated life testing per IEC61215 standard.
10. Purchaser acknowledges that all Apparent Inc products embody proprietary technology and intellectual property that is subject to trade secret protection, approved and pending patents, copyrights, trade name protections. Purchaser agrees not to disclose, reverse engineer, exploit or create derivatives of Apparent Inc products, technology and intellectual property and agrees to keep confidential Apparent Inc and its related entities' products, technology, trade secrets, and intellectual property.